Fred McKAY, Libelant,

v.

THE Motor Vessel SOKOL, Official Number 215,124, her engines, tackle, apparel, furniture and equipment, Respondent, and George Nix, Cross-Libelant.

No. 3687–KA.

District Court, Alaska,
First Division, Ketchikan.
Aug. 16, 1957.

W. C. Stump, of Stump & Bailey, Ketchikan, Alaska, for libelant.

C. L. Cloudy, of Ziegler, Ziegler & Cloudy, Ketchikan, Alaska, for respondent and cross-libelant.

KELLY, District Judge.

This action arose as a result of a collision between the M/V Eureka (hereafter referred to as the Eureka), owned by the libelant Fred McKay, and the M/V Sokol (hereafter referred to as the Sokol), owned by the respondent and cross-libelant, George Nix. The accident occurred about 150 yards off the entrance of Thomas Basin on September 23, 1955, at or about 2:15 p. m.

It was stipulated by the parties that the damages to the Eureka totalled $2,853.57 and the damages to the Sokol totalled $1,125.91.

The evidence shows that the Eureka had left its berth at Hansen's Store dock and was proceeding in a southeasterly direction towards the Union Oil Company station in the southeastern portion of the harbor area of Ketchikan; it maintained a course about 150 yards offshore and was proceeding at a speed of about 5 knots when the Sokol, in the act of entering Ketchikan Harbor from the Thomas Basin moorage, maintained a straight course directly out into the channel and collided with the Eureka and as a result of this collision both vessels were damaged in the amounts as set forth above; that at the time of the collision the weather was clear and the visibility

good; that the Sokol was traveling at a speed of about 7 knots.

There was independent testimony from disinterested witnesses tending to establish that the owner and master of the Sokol was in an intoxicated condition at the Potlatch Bar around noon or shortly thereafter, and another witness, who observed him at or about three o'clock in the afternoon, likewise verified his intoxicated condition.

I find, as a matter of fact, that a boat leaving Thomas Basin moorage entering Ketchikan Harbor, as it passes through the two dolphins marking the entrance of Thomas Basin, has an unobstructed view both up and down Tongass Narrows and especially of the Ketchikan Harbor in both directions from said entrance.

I find, as a matter of fact, that the respondent, probably because of his condition, failed to turn either starboard or port, failed to reduce speed or give any signal, but continued on a collision course straight out into the channel.

I find, as a matter of fact, that the libelant observed the approach of the Sokol from the time it passed the entrance of Thomas Basin and that libelant held course and speed until he realized, when the Sokol was about 60 feet from his vessel, that the respondent was not going to turn right or left, when he thereupon took evasive action, put his engine in full speed astern and his wheel hard right, turning, and that the Eureka was struck by the Sokol just forward of the pilothouse.

There is testimony to the effect that the ordinary fishing boat, such as the Sokol, if the wheel is put either hard right or hard left, can, within a distance of 60 feet, swerve in such a manner as to avoid striking an object directly ahead.

█ The testimony in the case shows definitely the improper handling of the Sokol and the definite negligence of the master and owner thereof in operating it in the fashion he did and in causing it to collide with the Eureka.

Counsel for respondent contends, however, that because of the conduct of the Eureka, it was guilty of the violation of certain rules of navigation and guilty of negligence to such a degree that even though the major fault was on the Sokol, because of the conduct of the Eureka the damages should be divided in accordance with maritime rules.

Respondent claims this negligence consists of the following:

(1) Violation of the narrow channel rule in that the Eureka was proceeding on her port side of the channel in Tongass Narrows.

(2) Failure to blow a one-blast whistle signal indicating the Eureka's intention to hold course and speed.

(3) Failure to blow a danger signal.

(4) Failing to maintain a proper lookout.

(5) Passing too close to the entrance of Thomas Basin.

It has been stated that "narrow channels" are bodies of water navigated up and down in opposite directions, and that they do not include harbor waters, with piers on each side, where the necessities of commerce require navigation in every conceivable direction. The Islander, 2 Cir., 1907, 152 F. 385; The No. 4, 2 Cir., 1908, 161 F. 847; The Klatawa, D.C. W.D.Wash., 1920, 226 F. 120.

The Court in the two earlier cases cited held that the "narrow channel" rule did not apply to that part of the Hudson River which served as a harbor for the City of New York. While the present situation differs, inasmuch as the commerce is comparatively light between Ketchikan and Pennock Island, across the Tongass Narrows from the city, whereas the New York Harbor has a great number of vessels crossing from one side to the other, still the traffic between various points along the Ketchikan Harbor renders the application of the "narrow channel" rule impractical within the harbor. It would create considerable hardship as well as new hazards to require that vessels traveling between two points within the Ketchikan Harbor

must proceed to the far side of The Narrows, crossing the north-bound lane of through traffic twice, to do so.

The two cases relied upon by the respondent to establish the application of the "narrow channel" rule in this case involved collisions which occurred in the Ketchikan area and in which the Court found that the "narrow channel" rule was applicable. In The Admiral Watson, D.C.W.D.Wash., 1920, 266 F. 122, the vessel had just rounded the north end of Pennock Island, preparatory to docking at Ketchikan, when it collided with a fishing vessel, the Helgeland, which was proceeding from the harbor. Judge Neterer, who decided the case, had previously defined a "narrow channel" in The Klatawa, supra, as excluding harbor waters. It is therefore apparent that the collision occurred outside of what was then considered Ketchikan Harbor.

In the other case cited by the respondent, Atlas Assurance Co., Ltd., of London, England v. The Cupid, 1952, D.C., 14 Alaska 108, 108 F.Supp. 590, the Court stated:

> "The collision occurred about midnight of April 24, 1950, on a clear night with fair visibility, in Tongass Narrows, a narrow channel, *south of and connecting with Ketchikan Harbor.*" (Emphasis supplied.)

■ While it is recognized that Tongass Narrows is a narrow channel, the "narrow channel" rule would not apply to local traffic in that part of the waters comprising the Ketchikan Harbor.

On the question of the Eureka's failure to blow a one-blast whistle signal to indicate its intention to hold course and speed, there does not appear to be any basis for imposing such a duty on the privileged vessel in a crossing situation. Article 18, Rule I of the Inland Rules provides for a one-blast whistle signal when one of two vessels approaching end on, or nearly so, proposes to pass port to port, or a two-blast whistle signal to indicate a starboard to starboard passing. However, as noted above, the present case involved a crossing situation and not a meeting end on. In the case of Compania De Navegacion Cebaco, S. A. v. The Steel Flyer, 4 Cir., 1952, 200 F.2d 643, 645, the Court observed:

> " * * * but in this case the vessels were not meeting head on or nearly so, but were on crossing courses and therefore Articles 19 and 21 * * * were applicable. These rules make no provision for the giving and acceptance of signals since they clearly provide that the vessel which has the other on her starboard side shall keep out of the way of the other while the other shall keep her course and speed. * * * "

■ It is true that the Eureka was obligated to sound a warning signal as soon as it became apparent that the Sokol was not going to respect the privileged vessel's right-of-way, and her failure to do so constitutes a fault. Under the major-minor fault rule established in The Pennsylvania, 1874, 19 Wall. 125, 136, 86 U.S. 125, 136, 22 L.Ed. 148, the Eureka, in order to escape liability for half of the damages resulting from the collision, must prove not only that the fault shown probably did not contribute to causing the collision, but also that it *could not* have so contributed. I find from the evidence that the libelant has sustained this burden, and that when he became aware that the Sokol did not intend to change course, a warning would have been too late to have prevented the collision.

■ The alleged failure to maintain a proper lookout must be rejected as a reason for holding the Eureka to be at fault. It seems unlikely that on a boat the size of those involved here it would be customary to have any one except the pilot serving as a lookout, but even if such a practice were the usual rule, the testimony of those aboard the Eureka was that they had seen the Sokol from the time she first emerged from Thomas Basin. Thus the absence of a lookout, if in fact the Eureka was obliged to have

**484**

one, could not have been a factor in causing the collision.

I find that the Eureka did not pass too close to the entrance of Thomas Basin, and that the Sokol had ample room in which to maneuver.

The libelant is entitled to recover for all damages sustained by the Eureka, and in addition, his costs and disbursements.

The foregoing shall constitute Findings of Fact and Conclusions of Law unless the parties desire additional Findings or Conclusions.

Judgment may be entered in accordance herewith.